**Certiorari Granted, March 1, 2013, No. 34,009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2013-NMCA-038**

**Filing Date: December 27, 2012**

**Docket No. 31,141**

**STATE OF NEW MEXICO,**

   **Plaintiff-Appellee,**

**v.**

**JEFF HUETTL,**

   **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY**
**Freddie J. Romero, District Judge**

Gary K. King, Attorney General
Yvonne M. Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

Jacqueline L. Cooper, Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**SUTIN, Judge.**

**{1}**    Defendant Jeff Huettl appeals his convictions for one count each of possession of a controlled substance (methamphetamine) and possession of drug paraphernalia. Defendant argues that his rights under both the New Mexico and the United States Constitutions were violated by the warrantless police entry into the motel room in which he was arrested. He also argues that his Sixth Amendment constitutional right to confront witnesses against him

1

was violated when the State failed to present the testimony of the forensic scientist who placed the seized substance on the spectrophotometer machine for testing and, instead, the State presented testimony of a different analyst who interpreted the results of the machine's data. We affirm.

**BACKGROUND**

**{2}** In October 2009, Police Officer John Clay in Roswell, New Mexico, was dispatched to the Frontier Motel to look into an "unknown disturbance" in Room 102 of the motel. From the outside of Room 102, through a gap in the curtains, Officer Clay observed Defendant sitting at a table using a lighter under a spoon attempting to heat up an unknown substance and then attempting to draw the substance into a syringe. Based on his training and experience, Officer Clay deduced that Defendant was preparing illegal narcotics (either methamphetamine or heroin) for injection. Officer Clay called for back-up, then went to the motel office to get a key for Room 102. Two fellow officers arrived; Officer Clay was concerned that if they did not enter the room immediately, the supposed illegal substance would be lost or destroyed or that Defendant was in danger of a possible overdose. Officer Clay and the other two officers used the key to enter Room 102. Defendant was arrested. Officer Clay collected a spoon with a white crystalline substance in it, a loaded syringe, a number of other syringes, and a small baggie as evidence. Field testing of the spoon and the loaded syringe indicated the presence of methamphetamine and amphetamine, and the evidence was later sent to the crime lab.

**{3}** In regard to the laboratory tests that proved the evidence included methamphetamine, the State presented forensic scientist and forensic lab supervisor, Shawn Hightower. Mr. Hightower explained that the evidence was analyzed using an infrared spectrophotometer, an instrument that directs infrared light onto the sample. Because different compounds transmit and absorb infrared light at different rates, the instrument generates data that gives analysts a "clear picture" and a "unique picture" of different compounds. The raw data produced by the spectrophotometer is interpreted by an analyst. As to the evidence in this case, Mr. Hightower reviewed the data and formed an expert opinion that the residue from the spoon and the substance from the plastic bag were methamphetamine. Mr. Hightower did not personally place the evidence onto the spectrophotometer because that aspect of the testing was done by another lab analyst, Karla Nardoni.

**{4}** A jury found Defendant guilty of possession of methamphetamine and possession of drug paraphernalia. On appeal, Defendant contends that the district court erred in denying his pretrial motion to suppress evidence, which was made pursuant to an argument that the warrantless police entry into Room 102 was not justified by any exception to the warrant requirement. Defendant further contends that the district court erred in permitting Mr. Hightower to testify about the spectrophotometer testing because "[Mr.] Hightower . . . was not the person who actually *tested* the purported methamphetamine." According to Defendant, because he did not have an opportunity to cross-examine Ms. Nardoni, he was deprived of his Sixth Amendment right to confrontation.

2

**{5}** For the purpose of conducting a thorough analysis of Defendant's confrontation claim, we requested supplemental briefing. The parties were asked to respond to the proposed conclusion that Defendant's confrontation right had been violated by the State's presentation of Mr. Hightower's testimony insofar as his testimony necessarily implied the propriety and correctness of Ms. Nardoni's testing process. In our order for supplemental briefing we also proposed the theory that Mr. Hightower's testimony, insofar as it relied upon Ms. Nardoni's work, "was effectively the functional equivalent of *ex parte* in court testimony" which was "no different than if a report containing the details of the conduct of the testing process . . . had either been relied on alone, or had been identified by a testifying surrogate[.]"

**{6}** We hold that exigent circumstances justified the officers' warrantless entry and that the court did not err in denying Defendant's motion to suppress. We further hold that because the evidence shows that Ms. Nardoni's role in the actual testing process appeared to have been limited to simply placing the substance onto the spectrophotometer, and because Mr. Hightower testified only as to his own analysis and interpretation of the data generated by the spectrophotometer, concluding that the evidence contained methamphetamine, Defendant's right to confrontation was not violated. Accordingly, we affirm.

## DISCUSSION

### The Suppression Issue

**{7}** Defendant unsuccessfully moved before trial to suppress "all evidence and statements obtained in violation of Article II, Section 10[] of the New Mexico Constitution and the Fourth Amendment [to] the United States Constitution." The motion was premised on Defendant's contention that the police entry into Room 102 was "warrantless and without basis in any exception to the warrant requirement." "An officer's warrantless entry into a person's home is the exact type of intrusion against which the language of the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution is directed." *State v. Gutierrez*, 2008-NMCA-018, ¶ 16, 143 N.M. 422, 176 P.3d 1154. It is well established in New Mexico that exigent circumstances, including the need to prevent destruction of evidence, may justify a warrantless home entry. *Id.*

**{8}** In denying Defendant's motion, the district court entered the following conclusions of law.

> 2. Officer Clay observed Defendant in plain view and had probable cause to believe that Defendant was in the act of possessing and using illegal drugs.

> 3. Officer Clay had probable cause to believe that Defendant was engaged in illegal activity and that if immediate entry into the room

3

was not made[,] that evidence would be lost or destroyed.

4.     Exigent circumstances existed for Officer Clay and the other officers to enter the room and seize the items observed without a warrant.

5.     Defendant did not have a reasonable expectation of privacy to that which could be observed by Officer Clay through partially opened curtains when Officer Clay was standing on a common walkway where anyone could see through the window without intruding into the room or using artificial means to observe.

6.     Defendant's rights under the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution were not violated.

(Citations omitted.)

**{9}** On appellate review of a motion to suppress evidence, we review the district court's factual determinations for substantial evidence and its legal determinations de novo. *State v. Ketelson*, 2011-NMSC-023, ¶ 9, 150 N.M. 137, 257 P.3d 957. Additionally, we review the district court's determination that an exigency existed de novo. *State v. Allen*, 2011-NMCA-019, ¶ 14, 149 N.M. 267, 247 P.3d 1152.

**{10}** Relying on *State v. Garcia*, 2005-NMSC-017, ¶ 29, 138 N.M. 1, 116 P.3d 72, and *State v. Gomez*, 1997-NMSC-006, ¶ 39, 122 N.M. 777, 932 P.2d 1, Defendant states that the New Mexico Constitution "requires a warrantless seizure of evidence from within a vehicle to be justified by a *particularized showing* of exigent circumstances." Defendant argues that there was no particularized showing that Defendant was in danger or that the evidence would have been destroyed. Accordingly, Defendant contends that the district court erred in finding that exigent circumstances justified a departure from the warrant requirement.

**{11}** Warrantless entry into a residence under the exigent circumstances rule requires probable cause plus exigent circumstances. *State v. Nance*, 2011-NMCA-048, ¶ 12, 149 N.M. 644, 253 P.3d 934, *cert. denied*, 2011-NMCERT-004, 150 N.M. 648, 364 P.3d 1171. Because Defendant does not raise an issue as to probable cause, we deem Defendant to have abandoned any argument to that effect. *See State v. Dickert*, 2012-NMCA-004, ¶ 34, 268 P.3d 515 (recognizing that "issues not argued on appeal are deemed abandoned"). We therefore focus on exigent circumstances.

**{12}** "Exigent circumstances means an emergency situation requiring swift action to prevent imminent danger to life or . . . to forestall the imminent . . . destruction of evidence." *Campos v. State*, 117 N.M. 155, 158, 870 P.2d 117, 120 (1994) (internal quotation marks and citation omitted). "The standard for determining exigency is an objective one; the question is whether in a given situation a prudent, cautious, and trained officer, based on facts known,

4

could reasonably conclude swift action was necessary." *Allen*, 2011-NMCA-019, ¶ 15 (internal quotation marks and citation omitted).

**{13}** The district court did not err in concluding that an exigency justified the officers' warrantless entry into Room 102. Officer Clay testified that Defendant's apparent intention to "shoot-up" presented two exigencies: the destruction of evidence that would occur if Defendant were to inject himself with the suspected illegal drugs; and the possibility that, as is "typical for I.V. drug users," Defendant would overdose.

**{14}** Substantial evidence supported the district court's conclusion "that if immediate entry into the room was not made[,] that evidence would be lost or destroyed" by virtue of Defendant's injection of the suspected illegal narcotics. The destruction of drug evidence presents a sufficient exigency to justify a warrantless entry. *See State v. Pool*, 98 N.M. 704, 707, 652 P.2d 254, 257 (Ct. App. 1982) (stating that an officer's warrantless entry into the defendant's hotel room was justified based on the officer's good faith belief that the defendant would flush the marijuana he had in his possession down the toilet). Under these circumstances, the district court properly concluded that the officers were justified in their actions. Because we conclude that the officers' warrantless entry was justified based on the destruction-of-evidence exigency, we do not further examine whether their actions were justified based upon the possibility of overdose from suspected intravenous drug use.

**{15}** Finally, to the extent that Defendant requests reversal on the basis of Officer Clay's alleged untruthfulness regarding his observation of Defendant " 'cook[ing]' methamphetamine for injection," we are not persuaded. Defendant's argument in this regard is based upon the testimony of a former drug user, who testified to having injected methamphetamine "an infinite number of times" and who stated that he, personally, had never cooked methamphetamine before injecting it, nor had he ever heard of or seen anyone doing so. The jury was free to draw its own conclusions regarding the credibility of the witnesses, and we will not second-guess its determination, nor will we reweigh the evidence nor substitute our own judgment for that of the jury. *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057.

**The Confrontation Clause Issue**

**{16}** Under the Sixth Amendment to the United States Constitution, "every criminal defendant shall enjoy the right . . . to be confronted with the witnesses against him." *State v. Tollardo*, 2012-NMSC-008, ¶ 15, 275 P.3d 110 (internal quotation marks and citation omitted). The Confrontation Clause applies to witnesses against the accused who provide testimony for the purpose of establishing or proving some fact. *Id.* We review claimed violations of the confrontation right de novo. *Id.*

**{17}** Current Confrontation Clause jurisprudence stems from *Crawford v. Washington*, 541 U.S. 36 (2004). In *Crawford*, the Court reinterpreted the Confrontation Clause by examining its historical underpinnings. *Id.* at 42-43. The Court explained that by adopting

the Confrontation Clause, the First Congress sought to eschew the civil law practice, which had, at times, been employed in England and in the colonies, of using the *ex parte* statements of witnesses against the accused which were "read in court in lieu of live testimony[.]" *Id.* at 43, 47-49. The civil law practice was marked by the trial presentation of witness statements that had been gathered through the private judicial or government-official examination of witnesses in the absence of the accused and without any opportunity for the accused to confront or "defend himself against his defamers." *Id.* (internal quotation marks and citation omitted).

**{18}** It is against this historical backdrop, the *Crawford* Court concluded, that the Sixth Amendment must be interpreted. *Id.* at 50. Focusing on "the principal evil at which the Confrontation Clause was directed[,]" *i.e.*, "the civil[]law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused[,]" the Court turned to the language of the Confrontation Clause, particularly its application "to 'witnesses' against the accused[.]" *Id.* at 50-51. "[I]n other words," the Court explained, the Confrontation Clause applies to "those who 'bear testimony.' 'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.* at 51 (alteration and citations omitted). Thus, the Court instructed, the Confrontation Clause applies specifically to testimonial out-of-court statements. *Id.* at 51.

**{19}** Although the *Crawford* Court declined to "spell out a comprehensive definition of 'testimonial[,]' " it identified a "core class of 'testimonial' statements[.]" *Id.* at 51-52, 68. This "core class of 'testimonial' statements" includes "*ex parte* in-court testimony or its functional equivalent[.]" *Id.* at 51. The "functional equivalent" of *ex parte* in-court testimony was defined by example as "material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[.]" *Id.* (internal quotation marks and citation omitted). Additionally, the Court articulated a guiding principle to be used in identifying testimonial statements—that is, to what extent does the alleged confrontation violation resemble "the abuses at which the Confrontation Clause was directed." *Id.* at 52, 68 (explaining that "[w]hatever else the term ["testimonial"] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations [because t]hese are the modern practices with [the] closest kinship to the abuses at which the Confrontation Clause was directed"); *see also Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221, 2242 (2012) (stating that the Confrontation Clause prohibits "modern-day practices that are tantamount to the abuses that gave rise to the recognition of the confrontation right"). *But see United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008) (explaining that a laboratory's "raw results" are not testimonial because data are not statements, a machine is not a witness against anyone, and "[p]roducing spectrographs . . . in court would serve no one's interests").

**{20}** Following *Crawford*, the Supreme Court decided three cases that are pertinent to our analysis insofar as they involved scientific reports: *Williams*, 132 S. Ct. 2221; *Bullcoming*

6

*v. New Mexico*, __ U.S.__, 131 S. Ct. 2705 (2011); and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). In *Melendez-Diaz*, the trial court admitted into evidence three "certificates of analysis" from the state forensic laboratory which stated that the laboratory, having analyzed a substance that was seized from the defendant, concluded that the substance was cocaine. 557 U.S. at 307-09 (internal quotation marks omitted). The Court determined that the admission of the certificates violated the defendant's right to confrontation because the certificates, which were "quite plainly affidavits[,]" fell within the "core class of testimonial statements" described in *Crawford*. *Melendez-Diaz*, 557 U.S. at 310-11 (internal quotation marks and citation omitted).

**{21}** In *Bullcoming*, the laboratory report of a non-testifying analyst that reflected the defendant's blood alcohol content was admitted into evidence at the defendant's trial in violation of the defendant's confrontation right. *Bullcoming*, 131 S. Ct. at 2709-10, 2718. Noting the similarities between the laboratory report in *Bullcoming* and the certificates/affidavits in *Melendez-Diaz*, the Court held that the *Bullcoming* report, like the *Melendez-Diaz* affidavits, "fell within the core class of testimonial statements[.]" *Bullcoming*, 131 S. Ct. at 2717 (internal quotation marks and citation omitted) (explaining that like the analysts in *Melendez-Diaz*, the non-testifying analyst in *Bullcoming* tested the evidence and prepared a formalized, signed document concerning the result of his analysis). The Court rejected the prosecution's attempt to meet the confrontation requirement by presenting the non-testifying analyst's report through in-court "surrogate testimony" of an analyst who had neither participated in nor observed the testing of the defendant's blood sample and who had no "independent opinion" concerning the defendant's blood alcohol content. *Bullcoming*, 131 S. Ct. at 2709-10, 2715-16 (internal quotation marks omitted). The Court explained that "when the [prosecution] elected to introduce [the non-testifying analyst's] certification, [the non-testifying analyst] became a witness" whom the defendant had the right to confront. *Id.* at 2716.

**{22}** In *Williams*, the plurality held that the defendant's confrontation right was not violated by the prosecution's presentation of testimony of a laboratory analyst who, having compared the defendant's DNA profile generated in her own laboratory with a DNA profile generated in an outside laboratory, testified that the two profiles were a match. *Williams*, 132 S. Ct. at 2229-30, 2239. *Williams* was a rape case, and the outside laboratory had generated a DNA profile from semen that was taken from the victim's sexual-assault kit. *Id.* at 2227-29. The defendant claimed a confrontation right violation that stemmed from the testifying analyst's affirmative answer to the prosecution's question, "[w]as there a computer match generated of the male DNA profile *found in semen from the vaginal swabs of [the victim]* to a male DNA profile that had been identified as having originated from [the defendant]?" *Id.* at 2236 (internal quotation marks omitted). The "argument advanced to show a Confrontation Clause violation" was that, because the testifying analyst lacked personal knowledge that the profile produced by the outside laboratory was, in fact, based on a sample from the victim's sexual assault kit, her affirmative answer to the prosecution's question constituted testimony concerning a fact about which the analyst had no personal knowledge—that is, that the outside laboratory produced a DNA profile from the victim's

7

sexual assault kit and not from another source. *Id.* This argument carried no weight with the plurality, however, which clarified that the analyst "did [not] testify to anything that was done at the [outside] lab, and she did not vouch for the quality of [the outside laboratory's] work." *Id.* at 2235. The plurality explained that the testifying analyst did not "testify to anything that was done at [the outside laboratory;]" rather, in answering the prosecution's question, she "simply assumed [the] premise [of the prosecutor's question] to be true[.]" *Id.* at 2235-36.

**{23}** The plurality in *Williams* held that the outside laboratory's DNA report was not admitted for the truth of the matter asserted therein; but, the plurality explained, even if it had been admitted for its truth, they "would nevertheless conclude that there was no Confrontation Clause violation." *Id.* at 2239-40, 2242. Relying on its *Crawford* historically based interpretation of the Confrontation Clause, the plurality reiterated that the "Confrontation Clause . . . prohibit[s] modern-day practices that are tantamount to the abuses that gave rise to the recognition of the confrontation right." *Williams*, 132 S. Ct. at 2242. But, the plurality cautioned, "any further expansion would strain the constitutional text." *Id.* The plurality reasoned that insofar as its primary purpose was not to accuse the defendant or to create evidence for use at trial, the DNA profile, in *Williams*, unlike the certificates/affidavits at issue in *Melendez-Diaz* and the report at issue in *Bullcoming*, bore "little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate." *Williams*, 132 S. Ct. at 2243-44 (internal quotation marks and citation omitted).

**{24}** In support of his claimed confrontation right violation, Defendant argues in his brief-in-chief that he was deprived of his right to confrontation when the State failed to produce Ms. Nardoni for cross-examination. Relying on *Bullcoming*, he reasons that, because Ms. Nardoni performed the "initial part of the testing[,]" he had a right to confront her on issues surrounding the following:

> the receipt of the substance from the police, the removal of the substance from the package, the confirmation of the substance's condition and the cross-reference of the substance's identification with the accompanying paperwork, the actual physical placement of the substance onto the infrared spectrophotometer and the initiation of the testing together with the confirmation that the testing was done properly and without [the] possibility of contamination or confusion with a different substance[.]

**{25}** In supplemental briefing, Defendant essentially reiterates the argument of his brief in chief, stating that he was deprived the opportunity to confront Ms. Nardoni "regarding the actual testing process of the sample at issue." Additionally, in response to our request for supplemental briefing, Defendant argues that the court erred in permitting Mr. Hightower to testify because it constituted the presentation of Ms. Nardoni's testimonial statement which was "no different than if [Ms. Nardoni's] report alone had been presented[.]" We examine Defendant's confrontation claims in turn, beginning with the claim that he was deprived of his right to confront Ms. Nardoni regarding her participation in the testing

process.

## A. Claimed Right to Confront Ms. Nardoni

{26} Considering Defendant's claim from a *Crawford* perspective, we do not believe that Ms. Nardoni's participation in the testing process bore any resemblance to the abuses at which the Confrontation Clause was directed. *See Crawford*, 541 U.S. at 68. The State in this case never attempted to admit into evidence any out-of-court "declaration or affirmation" of Ms. Nardoni. *See id.* at 51 (explaining that the focus of the Confrontation Clause is "witnesses against the accused" who have made "a solemn declaration or affirmation . . . for the purpose of establishing or proving some fact" (alteration, internal quotation marks, and citations omitted)). We note, too, that the data that was generated by Ms. Nardoni's operation of the spectrophotometer was not independently offered or admitted into evidence and that, even had it been admitted, there would be no confrontation concern because the spectrophotometer-generated graph was not a testimonial statement that would give rise to a confrontation right. *See Moon*, 512 F.3d at 361-62 (distinguishing the *non-testimonial raw data* produced by a scientific instrument from the testimonial *interpretation* of those data and holding that the defendant's confrontation right was not violated by the admission into evidence of a "readout" from an infrared spectrometer because the "readout" was not a testimonial statement).

{27} In short, no testimonial statement by Ms. Nardoni or a functional equivalent was admitted as evidence against Defendant. *See Crawford*, 541 U.S. at 50 (explaining that the Confrontation Clause was directed at the "principal evil" of the use of *ex parte* testimony as evidence at trial against the accused). Thus in no way was Ms. Nardoni a "witness against" Defendant; and, accordingly, Defendant did not have a constitutional right to confront her. *See id.* at 51 (explaining that the Confrontation Clause applies "to 'witnesses' against the accused" (citation omitted)). To the extent that Defendant claims that the testing process itself—that is, Ms. Nardoni's operation of the spectrophotometer that led to the production of raw data, was activity that constituted a testimonial statement that gave rise to his confrontation right, for the reasons that follow, we do not agree.

{28} *Williams*, *Bullcoming*, and *Melendez-Diaz* do not support the notion that a defendant has the right to confront a laboratory analyst who, having participated in some aspect of evidence analysis, nevertheless did not record any certifications, statements, or conclusions that were offered as evidence. Unlike the analysts in *Bullcoming* and *Melendez-Diaz*, Ms. Nardoni did not make, and the State did not seek to admit, any formal statements or declarations as to her testing process or as to her conclusions. Thus, unlike the affidavits in *Melendez-Diaz* and the certifications in the report in *Bullcoming*, no out-of-court statement of Ms. Nardoni's was offered or admitted into evidence that fell within, or even resembled, the core class of testimonial statements that are concomitant with the confrontation right. *See Bullcoming*, 131 S. Ct. at 2717 (concluding that the certificate in *Bullcoming*, like the *Melendez-Diaz* affidavits, "fell within the core class of testimonial statements" (internal quotation marks and citation omitted)); *see also Crawford*, 541 U.S. at 51 (stating that the

9

functional equivalent of *ex parte* in-court testimony is "material such as affidavits, custodial examinations, prior testimony . . . , or similar pretrial statements" (internal quotation marks and citation omitted)).

**{29}** Nor does *Williams*, with its admonition against "strain[ing] the constitutional text" by extending the reach of the Confrontation Clause beyond that which resembles "the historical practices that the Confrontation Clause aimed to eliminate[,]" support Defendant's argument that he had a right to confront Ms. Nardoni. *Williams*, 132 S. Ct. at 2242, 2244 (internal quotation marks and citation omitted). The testing process at issue in this case is akin to the process of the outside laboratory in *Williams*. Here, as in *Williams*, no inculpating report of the testing process or conclusions of a non-testifying analyst were offered or admitted into evidence. In both cases, the testifying analyst assumed the accuracy of a result that was not in evidence, but testified only to his or her independent conclusion when determining whether the test result matched another test result. Here, as in *Williams*, nothing that resembled the objectionable civil law practice of presenting *ex parte* testimony or its functional equivalent occurred.

**{30}** Defendant is left solely with a chain-of-custody attack based on the fact that Ms. Nardoni did not testify at trial regarding her placement of the evidence onto the spectrophotometer. In fact, at trial, Defendant argued that the State had not produced affidavits from the analyst who actually fed the substance into the machine and from the police evidence custodian and, therefore the foundation was insufficient because the chain of custody had failed. Defendant faced an upstream battle on this issue. Chain-of-custody testimony by Officer Clay and Mr. Hightower established that the substance in question was transported by Officer Clay from the motel room to the police department, where it was field tested, booked into "property" (a secure area of the police department), and then sent by Detective Fresquez from the police department to the laboratory.

**{31}** The absence of Ms. Nardoni's testimony regarding her role in the chain of custody went to the weight of the evidence not to the admissibility of it. *See Melendez-Diaz*, 557 U.S. at 311 n.1 (explaining that "gaps in the chain of custody normally go to the weight of the evidence rather than its admissibility" and stating that "it is not the case[] that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case" (alteration, internal quotation marks, and citation omitted)). The district court concluded that the chain of custody was sufficient because a "preponderance of the evidence" showed that the evidence was what it purported to be. *See State v. Rodriguez*, 2009-NMCA-090, ¶ 24, 146 N.M. 824, 215 P.3d 762 (stating that the admission of evidence is within the district court's discretion and that the court does not abuse its discretion "when the evidence is shown by a preponderance of the evidence to be what it purports to be"). Defendant does not challenge the district court's ruling in this regard.

**{32}** Defendant nevertheless asserts that *Bullcoming* stands for the proposition that chain-of-custody issues "bear with them confrontation rights," thereby arguing that he had a right

to confront Ms. Nardoni regarding her role in the chain of custody. The aspects of the *Bullcoming* analysis upon which Defendant rests his claim stand for the proposition that where an analyst has formally certified that she has properly performed specific chain-of-custody activities, and where that formal certification has been admitted into evidence, the defendant has a right to cross-examine the certifying analyst. *Bullcoming*, 131 S. Ct. 2714-15. We do not believe that the *Bullcoming* Court abrogated or intended otherwise to override the *Melendez-Diaz* Court's dictum, noted in the previous paragraph of this Opinion, that gaps in the chain of custody go to the weight, not the admissibility of evidence. *Melendez-Diaz.* 557 U.S. at 311 n.1. And here, unlike the non-testifying analyst in *Bullcoming*, no chain-of-custody certification was presented at trial.

{33}    In sum, under the circumstances of this case, we do not believe that Ms. Nardoni's role in the testing process gave rise to a Sixth Amendment right to confrontation. The Confrontation Clause applies specifically to the admission against a defendant of *ex parte* out-of-court testimony or its functional equivalent. In this case, no Ms. Nardoni-generated testimony or testimonial statement or its equivalent existed or was offered or admitted in evidence, and we see no legal basis upon which to conclude that Ms. Nardoni's activity came within the confrontation requirement. We turn now to Defendant's alternative confrontation violation theory.

**B.    Claimed Confrontation Violation by Mr. Hightower's Testimony**

{34}    The Confrontation Clause "forbids the introduction of testimonial hearsay as evidence in itself, but it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). Under *Crawford*, "[t]he question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay." *Johnson*, 587 F.3d at 635. Provided that the expert is applying personal training and experience to the evidence and provided that he or she testifies to his or her independent judgment, derived from an independent evaluation of that evidence, there will typically be no confrontation problem because the expert's opinion "will be an original product that can be tested through cross-examination." *Id.*

{35}    Since the Supreme Court's *Crawford* decision, there has emerged a clear divergence between two types of expert testimony in cases involving the presentation of scientific evidence, one permissible and one impermissible. What has emerged as clearly permissible under the Confrontation Clause and under the Federal Rule of Evidence 703, and the identical New Mexico Rule of Evidence, Rule 11-703 NMRA, is expert, scientific testimony based upon facts or data of which the expert has been made aware, even when those facts or data would otherwise be inadmissible, provided that the expert testifies only to his or her own, independently derived conclusions. *See, e.g.*, *Moon*, 512 F.3d at 360-62 (holding as permissible, under the Confrontation Clause and under Federal Rule of Evidence 703, testimony of a chemist who testified, based on the "output" of an infrared spectrometer,

11

which had been generated by a non-testifying lab analyst, that a substance in evidence was cocaine).

**{36}** In other words, an expert who has analyzed the raw data generated by another analyst and who has formed independent conclusions based upon that analysis may testify as to those conclusions. *See Williams*, 132 S. Ct. at 2233 ("[A]n expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks first-hand knowledge of those facts."); *Moon*, 512 F.3d at 362 (recognizing that "the Sixth Amendment does not demand that a chemist or other testifying expert have done the lab work himself" and holding that the testifying analyst "was entitled to analyze [and testify regarding] the data that [the non-testifying analyst] had obtained"); *see also United States v. Mirabal*, No. CR 09-3207 JB, 2010 WL 3834072, at *2, *4, *8 (D.N.M. Aug. 7, 2010) (permitting an expert to testify as to her own opinion based on her review of the raw data generated by a non-testifying analyst's testing of the substance at issue because "[t]he person whose opinions are being presented will be live in the courtroom and available for cross-examination, thus satisfying the Confrontation Clause"); *State v. Gonzales*, 2012-NMCA-034, ¶¶ 1, 19, 274 P.3d 151 (holding that the prospective cause-of-death testimony of a doctor who did not perform the autopsy would be permissible under the Sixth Amendment provided that the testimony was based on the doctor's own opinions based on her review of the raw data from the autopsy).

**{37}** What has emerged as clearly impermissible is an expert's testimony which is based solely upon a non-testifying analyst's analysis and conclusions. *See, e.g.*, *Bullcoming*, 131 S. Ct. at 2717-18; *State v. Moncayo*, 2012-NMCA-066, ¶¶ 3, 8-9, 12, 284 P.3d 423 (holding that the defendant's confrontation right was violated where an analyst testified as to the content of a report prepared by a non-testifying analyst and not to his independently derived expert opinion); *State v. Brewington*, 693 S.E.2d 182, 184-85, 189-90 (N.C. Ct. App. 2010) (reversing the defendant's conviction based on a confrontation violation that stemmed from the testimony of an analyst who, having reviewed another analyst's notes, lab report, and conclusions, testified that the evidence at issue was cocaine; but also explaining that had the testifying analyst "offered her own expert opinion based on independent analysis, then her use of the underlying report prepared by [the non-testifying analyst] as a source of data facilitating that analysis would not violate [the] defendant's right to confrontation").

**{38}** Under this impermissible scenario, the expert will have failed to form an independent opinion and is merely acting as a conduit for the presentation of a non-testifying witness's testimonial hearsay. *See Johnson*, 587 F.3d at 635 (stating that "[a]n expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as . . . a conduit or transmitter for testimonial hearsay"); *Brewington*, 693 S.E.2d at 191 (explaining that "[i]f the *substance* of a testimonial document is to be admitted into evidence, the author of the testimonial document must be subjected to confrontation"). This practice, commonly referred to as "parroting," is a violation of the right to confrontation. *See, e.g.*, *Johnson*, 587 F.3d at 635 (explaining that "[a]llowing a witness simply to parrot out-of-court testimonial statements . . . in the guise of expert

12

opinion" would constitute an impermissible evasion of the Confrontation Clause (internal quotation marks and citation omitted)).

**{39}** While Defendant would have us hold that Mr. Hightower's testimony falls into the impermissible category, the facts of this case do not permit such a conclusion. Mr. Hightower testified only as to his own analysis of the raw data generated by the spectrophotometer and to his independent conclusion based on his analysis of that raw data. His testimony was permissible under Rule 11-703. Further, he did not testify as to any testimonial statement or conclusion of Ms. Nardoni.

**Response To The Dissent**

**{40}** The dissent in over two pages discusses "the science and technology on which the infrared spectrophotometer test is based." Dissenting Op. ¶ 52. None of this was before the district court. In that discussion, the dissent characterizes the spectrophotometer test as consisting of two essential component parts: (1) focusing the beam on the sample of an unknown substance and (2) comparing the graphical chart produced by the machine to the graphical charts of known substances. Dissenting Op. ¶¶ 53-54. As to the first part, the dissent lists three safeguards that Ms. Nardoni needed to take to ensure that there was no cross-contamination of the unknown substance. Dissenting Op. ¶ 54. According to the dissent, because Ms. Nardoni was not able to testify about these safeguards, Defendant's right to confrontation was violated.

**{41}** There are two problems with this analysis. First, the record only has testimony regarding one safeguard. While Mr. Hightower was asked general questions about cleaning the surface of a spectrophotometer, no other possible safeguard was mentioned at trial. Secondly, there is a lack of preservation. The record reveals that Defendant at no time actually objected on confrontation grounds in relation to any particular safeguard, including the cleaning aspect of the testing. His objection was simply that Mr. Hightower was not the analyst who placed the evidence on the spectrophotometer.

**{42}** Even if we were to assume that the issue was preserved, our reading of supporting case law also differs from that of the dissent. The dissent principally relies on *Bullcoming* and on two cases decided only a few months apart by the District of Columbia Court of Appeals, *Roberts v. United States*, 916 A.2d 922 (D.C. 2007), and *Veney v. United States*, 929 A.2d 448 (D.C. 2007). Dissenting Op. ¶¶ 55, 57, 60-62. *Bullcoming* addressed facts considerably different from those in the case before us. *Bullcoming* held it to be error to admit, through the testimony of a "surrogate," a forensic laboratory report that included a determination of the defendant's blood alcohol content that had been completed by a non-testifying analyst. *Bullcoming*, 131 S. Ct. at 2713-16. Here, Mr. Hightower independently formed the opinion to which he testified. He was not a surrogate.

**{43}** The dissent cites to the text at footnote 1 in *Bullcoming*. Dissenting Op. ¶ 56. The footnote describes to some degree the standard testing protocol for gas chromatography. The

text is a general statement that says that "[s]everal steps are involved in the gas chromatograph process, and human error can occur at each step." *Bullcoming*, 131 S. Ct. at 2711. Here, the process is a spectrophotometer process, and the only human error possibly at issue is whether the surface upon which the substance was placed may not have been cleaned and may have contaminated the substance and the test causing the produced graph not to match the proven methamphetamine graph. If contamination had occurred, the tested substance presumably would not have matched the proven graph of methamphetamine. The dissent also cites footnote 7 in *Bullcoming*, Dissenting Op. ¶ 56, which indicates that had the analyst who actually completed the laboratory report testified, defense counsel could have raised questions as to the analyst's proficiency, the care he took in performing the work, and his veracity. *Bullcoming*, 131 S. Ct. at 2716 n.7. In the present case, the only question that defense counsel might have raised could have been whether Ms. Nardoni properly cleaned the equipment's surface. *Bullcoming* is not precedent or controlling Supreme Court case law requiring a determination that Defendant was denied his right of confrontation under the facts of this case.

**{44}** The dissent's reliance on *Roberts* and *Veney*, Dissenting Op. ¶¶ 60-62, both DNA cases, is unhelpful. First, these two cases, from one court and decided within months of one another, do not represent Supreme Court case law, and the dissent cites no other circuit courts that agree with the analyses in these cases. Second, these cases predate *Williams*, *Bullcoming*, and *Melendez-Diaz*. It would require a full-scale, separate analysis here as to how the analyses and results in those cases would have been affected by the Supreme Court's recent confrontation jurisprudence. In fact, *Williams* can be read to express the view that for confrontation purposes, in a DNA case, it should not be necessary to have all of the various analysts testify. *See Williams*, 132 S. Ct. at 2228 (noting that "[i]f DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable"). Third, a careful analysis of *Roberts* and *Veney* will show that they are distinguishable on their facts. And, fourth, *Veney* neither analyzed nor reached a conclusion as to whether the testifying analyst's testimony led to a violation of the defendant's confrontation rights. *Veney* assumed a violation and proceeded to decide the case on the ground that no plain error occurred. *Veney*, 929 A.2d at 469. Further, a careful review of *Williams* requires two conclusions: one, it does not support the dissent's view that Defendant's confrontation rights were violated; and two, for the reasons stated in this Majority Opinion, *Williams* is more reasonably read to support our result.

**{45}** Finally, the dissent over-simplifies and incorrectly asserts our positions in this Majority Opinion. We do not believe that had the State "been allowed to introduce the chart into evidence as [Ms. Nardoni's] 'report' through Mr. Hightower, Defendant's confrontation rights would have been violated." Dissenting Op. ¶ 58. To the contrary, as explained in this Opinion, viewed through a *Crawford* lens and carried forward in *Williams*, Ms. Nardoni's participation in the testing process bore no resemblance to the abuses at which the Confrontation Clause is directed. *See Crawford*, 541 U.S. at 50-51; *Williams*, 132 S. Ct. at

14

2292. Also, as we have stated, even if the spectrograph itself had been admitted into evidence instead of having simply been referred to by Mr. Hightower, because it was not a "testimonial statement," its admission would not have violated Defendant's confrontation rights. *See Crawford*, 541 U.S. at 50; *Williams*, 132 S. Ct. at 2242, 2244; *Moon*, 512 F.3d at 361-62. To the extent the dissent frames our analyses as anything to the contrary, Dissenting Op. ¶ 58, the dissent is mistaken.

**CONCLUSION**

**{46}** For the foregoing reasons, we affirm Defendant's convictions.

**{47} IT IS SO ORDERED.**

**JONATHAN B. SUTIN, Judge**

**I CONCUR:**

**CELIA FOY CASTILLO, Chief Judge**

**MICHAEL E. VIGIL, Judge (concurring in part, dissenting in part).**

**VIGIL, Judge (concurring in part, and dissenting in part).**

**{48}** I concur in the suppression issue disposition, but respectfully dissent in regard to the confrontation clause.

**{49}** The Sixth Amendment directs: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" *Crawford* holds that the right of confrontation protected by the Sixth Amendment applies to "testimonial" out-of-court statements. 541 U.S. at 51. For the following reasons, I conclude that the test results performed by Ms. Nardoni were admitted as substantive testimonial evidence at Defendant's trial and that Defendant was deprived of his right to cross-examine Ms. Nardoni in violation of his constitutional right of confrontation under the Sixth Amendment.[1] Since my

---

[1] The majority asserts, "there is a lack of preservation." Majority Op. ¶ 41. Respectfully, I disagree. ⁻ Even the State acknowledges in its answer brief that when Defendant objected to Mr. Hightower rendering an opinion about the evidence, "Defendant argued Mr. Hightower's opinion testimony would violate his right of confrontation because Mr. Hightower was not the analyst who had placed the evidence on the spectrophotometer and Mr. Hightower did not have firsthand knowledge of the chain of custody from the time the evidence left the Roswell Police Department." This was sufficient to preserve the issue for our review. *See State v. Griffin*, 2003-NMCA-051, ¶ 5, 130 N.M. 595, 28 P.3d 1136

colleagues in the majority disagree, I dissent.

**{50}** *Crawford* does not set forth a comprehensive definition of what constitutes a "testimonial statement." Rather, *Crawford* sets forth various formulations of the "core class of 'testimonial' statements" to which the confrontation right extends. *Id.* One such formulation is "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Id.* at 52 (internal quotation marks and citation omitted).

**{51}** In this case, Officer Clay seized the evidence from Room 102 that was used to convict Defendant. The evidence included a spoon and a plastic bag, both of which contained an unknown white crystalline substance, and they were sent to the State forensic laboratory in Hobbs for analysis. The evidence was collected in a criminal case for possession of a controlled substance, the evidence was sent to the State forensic laboratory for the express purpose of proving that it contained a controlled substance, and using the results of that test in a criminal prosecution to prove an essential element of the crime against Defendant. The laboratory test results were therefore clearly statements "that were made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial[.]" *Id.* (internal quotation marks and citation omitted). As such, the laboratory test results constitute "testimonial" out-of-court statements under the Confrontation Clause of the Sixth Amendment.

**{52}** To answer the question before us requires that we determine what the results of an infrared spectrophotometer test consist of. Thus, I begin with the science and technology on which the infrared spectrophotometer test is based.

> The Fourier Transform Infrared Spectrophotometer (FTIR) was developed from the base technology of an Infrared Spectrometer (IR) which was first discovered at the turn of the century. Infrared radiation refers to the wavelengths of light that are just beyond the color red in the visible spectrum of light. Infrared radiation is absorbed by various materials in different ways. This variance in absorption is measurable by sensors contained within an IR and an FTIR as infrared radiation is passed through a sample of material. The traditional IR was little more than a prism disbursing light.
>
> The FTIR expanded upon the IR technology with a two[-]way mirror device which splits the single beam of infrared light into two beams—passing one beam through the sample of material and then putting the two beams

---

("The purpose of the preservation requirement is twofold: (1) that the trial court be alerted to the error so that it is given an opportunity to correct the mistake, and (2) that the opposing party be given a fair opportunity to meet the objection." (internal quotation marks and citation omitted)).

16

back together. The reunited beam of light now has different characteristics than it originally did based upon the absorption of various wavelengths of light by the unknown sample of material. A complex mathematical equation (named a Fourier Transform) is then applied to the wavelengths in order to separate out the intensity of each independent wavelength. The computer within the FTIR then produces a graphical representation of those wavelengths which can be compared visually and with computer aids against graphs produced by known substances.

*People v. Roraback*, 666 N.Y.S.2d 397, 399 (N.Y. Sup. Ct. 1997), *aff'd* 668 N.Y.S.2d 781 (N.Y. App. Div. 1998); *see People v. Bartee*, 814 N.E.2d 238, 241 (Ill. App. Ct. 2004) (explaining that the infrared spectrophotometer works by sending a beam of infrared light onto the unknown sample, and because different drugs, and different molecules in general, absorb infrared light at different wavelengths and degrees, the machine produces a chart that can be compared to charts of known standards to identify the unknown substance); *Cole v. State*, 835 A.2d 600, 605 (Md. 2003) (stating that the infrared spectrophotometer produced a graphical representation of an infrared spectrum generated by the tested unknown substances that was substantially similar to the spectrum generated by a "library" test result of a known substance (internal quotation marks omitted)); *State v. Lee*, 593 A.2d 235, 236-37 (N.H. 1991) ("The IR spectrophotometer operates by focusing a beam of radiant light on the substance. It then measures the amount of energy absorbed, and graphs the energy spectrum emitted. Each substance has a unique graph pattern of energy peaks and valleys. By comparing this pattern with the graph of a 'known' substance, the expert can evaluate whether the substances are the same."). Although not as detailed, Mr. Hightower's testimony about the test conducted in this case is consistent with these descriptions of the test.

{**53**}    Thus, there is one infrared spectrophotometer test which consists of two essential component parts. First, an infrared beam of light is focused onto a sample of an unknown substance. This results in a graphical pattern of energy peaks and valleys which is reported on a graphical chart produced by the machine because different substances absorb infrared light at different wavelengths and degrees. Second, the graphical chart of the unknown substance produced by the machine is compared to a library of graphical charts of known substances (reference charts), and when there is a match between the charts, a conclusion can be made about what the unknown substance is. The first part of the test was performed by Ms. Nardoni, who did not testify, and the second part was performed by Mr. Hightower, who did testify. Further, the analysis undertaken in the second part of the test by Mr. Hightower is only valid if the work performed in the first part was properly performed by Ms. Nardoni.

{**54**}    As the forensic scientist who performed the first part of the test, Ms. Nardoni was required to take measures to ensure that the machine obtained an accurate graphical representation of the wavelengths of the unknown substance. Mr. Hightower testified that to insure there is no cross-contamination with the unknown substance being tested, safeguards must be manually performed for each test: (1) only one case is tested at a time

17

so that substances from other cases are not all out at one time; (2) the person doing the test must make sure all of the lab area is cleaned before any future test is performed; and (3) the surface where the material is placed inside the spectrophotometer must be cleaned before each test is performed. However, Mr. Hightower was unable to testify whether these safeguards were performed by Ms. Nardoni, and he could not comment on whether any other required steps to insure a valid result were performed by her, "because I didn't see those tests."[2]

_____

[2] The majority asserts that "the record has only testimony regarding one safeguard" which consists of cleaning the surface of the spectrophotometer, Majority Op. ¶ 41; that "the only human error possibly at issue is whether the surface upon which the substance was placed may not have been cleaned," Majority Op. ¶ 43; and that "the only question that defense counsel might have raised could have been whether Ms. Nardoni properly cleaned the equipment's surface." *Id.* These assertions are refuted by the actual testimony. During Mr. Hightower's testimony a note was sent by the jury asking about cross contamination. The court then asked the following questions, and Mr. Hightower answered as follows:

Q. Mr. Hightower I have few questions for you.

A. Yes sir.

Q. Has there ever been a time where cross-contamination occurred?

A. We have several preventive measures against that, and to my knowledge no, there's never been a time we only do, all we do one case at a time so we don't have all the cases out at once and we make sure our lab area is clean before any future cases are done and in the case of the infrared spectrophotometer the material is placed right on it. It's cleaned before the next sample and a background is actually run before to make sure that it is clean and, if it wasn't cleaned, you would actually be able to see it on the examining surface and the test wouldn't proceed so, to my knowledge, no.

Q. Is the evidence and I believe it says, other substance or your substance side by side during testing?

A. That, the . . . the evidence, the items possibly could be side by side like I said case wise, there would be no other cases open at this . . . besides this case right here. So, yes there are times when you line up your vials and you will . . . ‑you will do the items to . . . . They'll be side by side but as far as any other cases, no.

Q. If a machine can give a false, positive, or negative, is there a way to do a manual test and was that performed. Was one performed?

18

**{55}** Thus, this case is similar in one material respect to *Bullcoming*. In *Bullcoming*, a forensic laboratory report setting forth the defendant's blood-alcohol content (BAC) was completed and signed by the analyst who tested the defendant's blood using a gas chromatograph machine. 131 S. Ct. at 2710-11. The gas chromatography process entails inserting vials of the suspect's blood into the gas chromatograph machine which then produces a printed graph along with calculations representing a software-generated interpretation of the data. *Id.* at 2711 n.1. The results are then recorded by the analyst on the forensic laboratory report. *Id.*

**{56}** The *Bullcoming* Court noted that "[s]everal steps are involved in the gas chromatograph process, and human error can occur at each step." *Id.* at 2711. The Court added that while the state had presented testimony that an accurate BAC measurement merely entails looking at the machine and recording the results, "the matter is not so simple or certain" because the analyst "must be aware of, and adhere to, good analytical practices and understand what is being done and why." *Id.* at 2711 n.1. The Supreme Court further observed, "Errors that occur in any step can invalidate the best chromatographic analysis, so attention must be paid to all steps" and that "93% of errors in laboratory tests for BAC levels are human errors that occur either before or after machines analyze samples." *Id.* (internal quotation marks and citation omitted). At footnote 7, the Supreme Court added that the testimony of the analyst who performed the test under oath "would have enabled Bullcoming's counsel to raise before a jury questions concerning [his] proficiency, the care he took in performing his work, and his veracity." *Id.* at 2716 n.7.

**{57}** Mr. Hightower could not present any testimony or evidence of what Ms. Nardoni did, how she did it, or why. All that Mr. Hightower had was the graphic chart which the spectrophotometer machine produced as a result of her actions. Mr. Hightower then told the jury that in his opinion, the known reference graph pattern of methamphetamine matched the graph pattern of the unknown substance which Ms. Nardoni produced.

---

A.    The manual test uh . . .

Q.    And maybe I need to make it clearer, and it appears to be two parts to the question. And, I'll just quote it. "A machine can give false, positive, or negative. Is there a way to do a manual test and was one performed?"

A.    There is . . . . I think . . . . There's a manual test on the instrument, um that we test the standard that's part of our weekly test. I'm not sure if that's what you're asking. There are other manual tests as far such as color tests and stuff like that. Those are performed um but, I really can't testify to that, because I didn't see those tests. So, I can testify to this data, since I wasn't there to see any other color tests or anything like that I can't comment on those.

19

**{58}** It seems clear, and the majority does not appear to dispute, that if Ms. Nardoni had dated and signed the chart of the unknown substance produced by the machine, and the State had been allowed to introduce the chart into evidence as her "report" through Mr. Hightower, Defendant's confrontation rights would have been violated. *See id.* at 2709-10, 2717-18; *Melendez-Diaz*, 557 U.S. at 307-11. Nevertheless, the majority concludes that no confrontation violation occurred because the chart itself was not introduced into evidence. However, this overlooks the fact that without the chart produced by Ms. Nardoni, Mr. Hightower had nothing to compare the reference chart of known methamphetamine to. Moreover, Mr. Hightower testified that the chart of the unknown substance produced by Ms. Nardoni's operation of the infrared spectrophotometer was identical to the known reference graphic chart of methamphetamine. The end result, therefore, was that the chart produced by Ms. Nardoni's work was considered as substantive evidence. Applicable case law leads me to conclude that a constitutional confrontation violation resulted.

**{59}** I first note that the case law addressing whether the work of a non-testifying expert has been admitted and considered as substantive evidence in a jury trial is extremely limited. The majority fails to cite to any applicable authority, and I have only found two cases, both of which predate *Melendez-Diaz*, *Bullcoming*, and *Williams.*

**{60}** In *Roberts v. United States*, 916 A.2d 922, 925 (D.C. 2007) (per curiam), a supervisory DNA analyst who did not actually conduct the testing testified that the defendant's DNA matched DNA taken from the victim's clothing. The testing consisted of three parts: a serologist who conducts tests on material for the presence of blood, semen, or other biological fluids suitable for DNA analysis; a PCR/STR technician who prepares test samples for DNA-typing and operates the instrument that actually determines the DNA types found in the samples; and an analyst who interprets the data produced by the DNA-typing instrument and memorializes his conclusions in a report. *Id.* at 937. The testifying supervisory analyst did not perform any of these tests but nevertheless testified that the opinions he was testifying to were his own because he went through the case as if it were his own and came to his own conclusions and interpretations. *Id.* at 937-38. While the written report of the non-testifying analyst was not introduced into evidence, the testifying supervisory analyst referred to it from time to time in his testimony. *Id.* at 938. Thus, the prosecution conceded that some of the test results on which his opinion was based "were offered as substantive evidence," and the court concluded that the defendant "was erroneously denied the right to cross-examine witnesses whose conclusions formed part of the DNA evidence against him." *Id.* at 939.

**{61}** Similarly, in *Veney v. United States*, the prosecution's expert testified that the defendant's DNA matched DNA found on various articles of the victim's clothing. 929 A.2d 448, 468 (D.C. 2007), *modified by* 936 A.2d 809 (D.C. 2007). She based her conclusion on data generated by foundational tests on the clothing conducted by two other scientists who did not testify. *Id.* One scientist tested the clothing for blood and semen, and the second operated a machine that performed a PCR/STR analysis which resulted in a computer-generated graph produced by the machine. *Id.* at 468-69. While the testifying expert used

20

her own interpretation of the DNA evidence, she "made references to the serology tests and the data produced by the operation of a DNA-typing instrument, both carried out by other scientists on the team[.]" *Id.* at 469. Thus, the court concluded, the foundational test results were arguably offered as substantive evidence, and assuming a constitutional violation, the court proceeded to determine whether plain error resulted from admission of the evidence. *Id.* at 469; 936 A.2d at 810; *see also Gardner v. United States*, 999 A.2d 55, 61 (D.C. 2010) (stating that *Veney* concluded that the foundational test results were offered as substantive evidence because the testifying expert referred to them).

**{62}**    *Veney* and *Roberts* are directly on point. In the case before us, Mr. Hightower testified that he referred to the graphic chart of the unknown substance produced by Ms. Nardoni's operation of the infrared spectrophotometer and that the graphic chart of the unknown substance matched the reference graphic chart of methamphetamine. Majority Op. ¶ 3. Mr. Hightower's testimony that the two charts are the same resulted in the chart of the unknown substance being admitted before the jury as substantive evidence against Defendant. Stated another way, the result of Ms. Nardoni's work (the graphic chart of the unknown substance) was placed in evidence for the truth of the matter asserted—that the graphic chart resulting from her work is identical to a reference chart produced by methamphetamine (the known substance). Thus, while the piece of paper which itself depicted the chart was not introduced into evidence, the information contained on the chart was. However, Defendant was not given an opportunity to cross-examine Ms. Nardoni, the forensic scientist who performed the part of the infrared spectrophotometer test which resulted in that chart.

**{63}**    The majority also concludes that the spectrophotometer graph generated by the machine is not a "statement" and therefore it "was not a testimonial statement." Majority Op. ¶ 26. In support of this conclusion, the majority relies on *Moon*, 512 F.3d at 361-62, which states, "Yet the instruments' readouts [from an infrared spectrometer and a gas chromatograph] are not 'statements', so it does not matter whether they are 'testimonial.'" Majority Op. ¶ 26. Respectfully, I disagree, as it seems well settled that assertions of fact generated by a computer are considered as hearsay statements that must qualify as a hearsay exception to be admissible. *See* Rule 11-801(C) NMRA (defining hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted); *Roark v. Farmers Group, Inc.*, 2007-NMCA-074, ¶¶ 24-29, 142 N.M. 59, 162 P.3d 896 (concluding that a computer-generated document is admissible as a business record exception to the hearsay rule); *State ex rel. Elec. Supply Co. v. Kitchens Constr., Inc.*, 106 N.M. 753, 756, 750 P.2d 114, 117 (1988) (concluding that computer data compilations may be construed as business records that are admissible as an exception to the hearsay rule under Rule 11-803 NMRA). In his dissent in *United States v. Washington*, 498 F.3d 225, 233 (4th Cir. 2007), Judge Michael cites to

numerous cases[3] in stating, "Courts consistently consider computer-generated assertions of fact as hearsay that are admissible only under one of the exceptions to the hearsay rule."  I also agree with Judge Michael that although test results may be computer-generated, if they are generated with the assistance and input of a technician or scientist, they must be attributed to the technician or scientist.  *Id.*[4]  This seems to be implicit in *Bullcoming* when the Supreme Court concluded that although there was evidence that the analyst who tested the defendant's blood merely looked at the gas chromatography machine and recorded the results on a report into evidence, admission of the report violated the defendant's right of confrontation because the analyst who filled out the report did not testify.  131 S. Ct. at 2710-11 & n.1.

{64}  The unknown substance in this case was tested so the results could be used against Defendant in a criminal prosecution against him.  The results clearly constituted a testimonial statement and without testimony from the person performing the test, inadmissible under the Confrontation Clause.  That was the factual backdrop and result in *Bullcoming*, *Melendez-Diaz*, and *Crawford*.  *See Bullcoming*, 131 S. Ct. at 2717; *Melendez-Diaz*, 557 U.S. at 310; *Crawford*, 541 U.S. at 68.

{65}  Moreover, *Williams* is of no assistance to the result reached by the majority here.  *Williams* was a bench trial without a jury in which an expert witness in forensic biology and forensic DNA analysis testified that in her opinion, DNA profiles produced by two separate tests matched.  132 S. Ct. at 2230-31.  The first DNA profile was provided by a test conducted by Cellmark Diagnostic Laboratory (Cellmark) of vaginal swabs taken from a

---

[3] "*United States v. Blackburn*, 992 F.2d 666 (7th Cir. 1993) (computer printouts of lensometer readings); *United States v. Enterline*, 894 F.2d 287 (8th Cir. 1990) (computer report identifying vehicle as stolen); *United States v. Baker*, 855 F.2d 1353 (8th Cir. 1988) (laboratory analyses of controlled substances); *United States v. DeWater*, 846 F.2d 528 (9th Cir. 1988) (breathalyzer test result); *United States v. Hardin*, 710 F.2d 1231 (7th Cir. 1983) (computer-generated graph of data collected by law enforcement); *United States v. McKinney*, 631 F.2d 569 (8th Cir. 1980) (blood test results); *State v. Madorie*, 156 S.W.3d 351 (Mo. 2005) (breathalyzer test result); *City of Helena v. Hoy*, 248 Mont. 128, 809 P.2d 1255 (1991) (same)."

[4] On the other hand, if the computer-generated assertion is produced without any human assistance or input, it cannot be considered a person's assertion.  *See United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005) (noting that the computer-generated header information that accompanied an image on the internet was not a hearsay statement because it was automatically generated by the computer without the assistance or input of a person); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003) (concluding that the transmission information on a faxed document was not a hearsay statement because it was automatically generated by the fax machine).  *Washington*, 498 F.3d at 233 (Michael, J., dissenting).

rape victim before the defendant or anyone else was under suspicion for the rape. *Id.* at 2229. The second DNA profile was provided by a test conducted by the state police lab from a sample of the defendant's blood that was taken after he was arrested on an earlier unrelated charge. *Id.* The analyst who performed the test at the state police lab testified at trial, but no one from Cellmark testified. *Id.* at 2229-30. The Cellmark report itself was not admitted into evidence, and the expert did not quote or read from the report or identify it as the source of any of her opinions. *Id.* at 2230. The United States Supreme Court had no trouble in concluding that neither test report was a "testimonial statement" under the Confrontation Clause because neither one was made when the defendant was a target of the rape investigation, and thus not made for the primary purpose of accusing a targeted individual. *Id.* at 2242-44. Without a "testimonial statement" there was no constitutional confrontation violation. *Id.* On the other hand, the statement before us in this case is testimonial. Further, because the expert in *Williams* testified that it was a commonly accepted practice in the scientific community for one DNA expert to rely on the records of another DNA expert, that Cellmark was an accredited crime lab and that she and experts in her field regularly relied on the protocols used in this case, *id.* at 2229-30, the United States Supreme Court concluded the expert testimony was admissible under the Federal Rules of Evidence. *Id.* at 2233-35. *See* Fed. R. Evid. 703 (stating that an expert may base an opinion on facts or data "that the expert has been made aware of or personally observed," and "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted"). New Mexico's counterpart to the federal rule is Rule 11-703. However, in this case, the State failed to lay a foundation to allow Mr. Hightower to express an opinion based on the part of the test performed by Ms. Nardoni. Even if it had, the objection based on the Confrontation Clause would remain. Finally, the United States Supreme Court concluded, because this was a bench trial there was no danger that the fact finder improperly considered inadmissible hearsay evidence. *Williams*, 132 S. Ct. at 2236. On the other hand, the majority in *Williams* also conceded that the dissent's argument to the contrary "would have force" if the defendant had been tried by a jury. *Id.* This case, unlike *Williams*, was tried to a jury.

**{66}** Finally, I disagree with the majority that Mr. Hightower gave his conclusions based on his independent evaluation of Ms. Nardoni's work product. Majority Op. ¶ 39. Because an infrared spectrophotometer test is performed in two distinct parts, and Mr. Hightower could not evaluate whether Ms. Nardoni properly performed the first part of the test, he was in fact used as a "mere conduit" to present her testimonial hearsay evidence to the jury. *Melendez-Diaz* notes that confrontation and cross examination are designed to "weed out not only the fraudulent analyst, but the incompetent one as well" and notes that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials." 557 U.S. at 319. Those concerns continue.[5] We have no evidence that Ms. Nardoni was either

---

[5] Peter Jamison, *SFPD Crime Lab's DNA Evidence Could Be Tainted by Concealed Mistakes*, SF Weekly, Dec. 15, 2010, *available at*

fraudulent or incompetent, but if such was the case, it would escape detection if, as the majority holds, the results of her work could simply be parroted by a witness such as Mr. Hightower who had no knowledge of whether she followed proper protocols necessary for a valid test result.

{67}     Unlike my colleagues in the majority, I conclude that a testimonial statement (the graphic chart) of a witness (Ms. Nardoni) was admitted into evidence in violation of Defendant's right under the Confrontation Clause of the Sixth Amendment because Defendant was unable to cross-examine Ms. Nardoni.  I therefore dissent.

_____

**MICHAEL E. VIGIL, Judge**

**Topic Index for** *State v. Huettl***, No. 31,141**

**APPEAL AND ERROR**
Standard of Review

**CONSTITUTIONAL LAW**
Confrontation
Suppression of Evidence

**CRIMINAL LAW**
Controlled Substances

**CRIMINAL PROCEDURE**
Exigent Circumstances
Expert Witness
Motion to Suppress
Right to Confrontation
Warrantless Search
Witnesses

**EVIDENCE**
Drug Testing
Expert Witness

_____

http://www.sfweekly.com/2010-12-15/news/sfpd-s-troubled-crime-lab-more-evidence-of-screwups-and-coverups/; Eugenie Samuel Reich, *Boston Scandal Exposes Backlog*, Nature, Oct. 9, 2012, *available at* http://www.nature.com/news/boston-scandal-exposes-backlog-1.11561; David Boeri, *State Lab Chemist Told Police She Intentionally Falsified Test Results*, WBUR, Sept. 27, 2012, *available at* http://www.wbur.org/2012/09/27/annie-dookhan-statement.

Suppression of Evidence