Cheshire
No. 89-530

### THE STATE OF NEW HAMPSHIRE

v.

### ROBERT E. LEE, JR.

July 3, 1991

*John P. Arnold,* attorney general (*Donald Feith,* assistant attorney general, on the brief, and *Mark S. Zuckerman,* assistant attorney general, orally), for the State.

*W. Kirk Abbott, Jr.,* assistant appellate defender, of Concord, by brief and orally, for the defendant.

HORTON, J. The defendant, Robert Lee, was convicted after a jury trial in the Superior Court (*McHugh*, J.) on six counts of sale or possession of controlled substances. RSA 318-B:2, :26, I, II. He appeals his convictions on three of these charges, asserting that the trial court erred in admitting the State's experts' opinions about the identity of the substances. He claims that the State failed to establish the accuracy of the infrared spectrophotometer used in the tests. For the reasons explained below, we reject the defendant's argument and affirm.

The defendant was arrested on March 7, 1989, at the onset of a sale transaction involving a white powder, suspected to be cocaine. A search of the defendant's car led to the discovery of a quantity of suspected marijuana. Testimony at trial revealed that pursuant to an undercover investigation, a State trooper had engaged in prior sale transactions with the defendant on January 5, 1989, for suspected cocaine, February 16 for suspected codeine and valium, and March 6 for suspected cocaine. The charges reached trial in the following form: (1) grand jury indictment for sale on January 5—cocaine; (2) grand jury indictment for sale on February 16—codeine; (3) grand jury indictment for sale on February 16—valium; (4) grand jury indictment for sale on March 6—cocaine; (5) grand jury indictment for possession with intent to distribute on March 7—cocaine; and (6) information for possession on March 7—marijuana. After trial, the jury convicted on all charges other than the possession with intent to distribute, on which the defendant was convicted of plain possession. The defendant appeals the convictions on the first three indictments listed.

Pertinent to the matters appealed, the State presented the testimony of two laboratory analysts to establish the identity of the suspected substances, criminalist Frank Powell, who tested the powder purchased in January, and criminalist Philip Harmon, who tested the pills purchased in February. Each testified that he had conducted a series of four tests on the substances. The first three tests were non-specific, narrowing the general characteristics of the substance. Only the fourth test, the infrared (IR) spectrophotometer test, established the presence of the controlled substance in the tested samples and its exact identity.

The IR spectrophotometer operates by focusing a beam of radiant light on the substance. It then measures the amount of energy absorbed, and graphs the energy spectrum emitted. Each substance has a unique graph pattern of energy peaks and valleys. By comparing this pattern with the graph of a "known" substance, the expert

can evaluate whether the substances are the same. Using this method, the State determined that the materials sold by the defendant contained controlled substances.

The defendant contends that absent evidence of an instrument's accuracy, test results and opinions based on those results are inadmissible. On the challenged tests, because the State could not establish if, or when, the machines had been calibrated, he sought to have the results stricken and also sought a directed verdict. In his argument he refers us to *State v. Ahern*, 122 N.H. 744, 449 A.2d 1224 (1982), in which we stated that "results of scientific tests are inadmissible unless there is proof that the test device was operating accurately and that the test was performed by qualified individuals." 122 N.H. at 745, 449 A.2d at 1225. From this he urges that the State's failure to establish proper calibration of the IR spectrophotometer prior to the tests conducted by Powell and Harmon should result in the exclusion of their expert testimony.

■ The defendant correctly points out that we have recognized the unique nature of scientific tests and have predicated the admissibility of evidence based on such tests on "proof that the test device was operating accurately . . . ." *Ahern*, 122 N.H. at 745, 449 A.2d at 1225. This imposes a responsibility upon the proponent seeking admission of such evidence to establish the *prima facie* reliability of any test results. *See, e.g., State v. Roberts*, 102 N.H. 414, 417, 158 A.2d 458, 460 (1960). We have never determined the exact scope of such "proof".

■ The defendant urges that we adopt a standard requiring the proponent to "establish that the machine was operating accurately." Such a position is in conflict with the language and purpose of our Rules of Evidence. Rule 901 states:

"(a) *General provision.*—The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) *Illustrations.*—. . . [T]he following are examples of authentication. . . .

(9) *Process or system.*—Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result."

N.H. R. Ev. 901. Rule 901 does speak to the question whether the machine is reliable. *See United States v. Downing*, 753 F.2d 1224,

1240 n.21 (3d Cir. 1985) (interpreting identical federal counterpart of Rule 901). It does not, however, place formal requirements on such proof. The trial court must make this determination. *See Roberts supra.*

■■ We do not regulate which way the State must show the accuracy of an instrument. Indeed, requiring a documented calibration within any time frame, be it six hours or six days, would be arbitrary, and in specific cases either too broad or too limited. The logic of the test, whether an absolute measurement, as in radar or timed speed checks and blood alcohol tests, a relative comparison, as with hair or blood samples, or a comparison against an absolute, as in this IR spectrophotometer process, calls for different degrees of "proof" of accuracy. While several State legislatures have chosen to regulate the foundational requirements, *see, e.g.,* ME. REV. STAT. ANN. tit. 29, § 1312(6) (Supp. 1990), the rule leaves it to the discretion of the trial court to determine when a sufficient showing of the particular instrument's accuracy has been made. *Accord Commonwealth v. Whynaught,* 377 Mass. 14, 19, 384 N.E.2d 1212, 1215–16 (1979); *United States v. Downing,* 753 F.2d at 1241; *State v. Chambers,* 444 N.W.2d 667, 669 (Neb. 1989).

■ These evidentiary determinations rest in the trial court's sound discretion, and will not be overturned by us unless clearly erroneous. *State v. Gruber,* 132 N.H. 83, 85, 562 A.2d 156, 163 (1989); *State v. Roberts,* 102 N.H. at 417, 158 A.2d at 460. Looking at the record below, we find that the court concluded correctly that a *prima facie* foundation for the machine's accuracy and the test's reliability had been laid.

The two experts whose testimony is challenged testified to having experience using the IR spectrophotometer (Frank Powell—over one year; Philip Harmon—eighteen years). Their combined testimony indicated that the machine is self-calibrating for sixteen to twenty parameters and that "[e]very machine that is used in the lab is calibrated daily" as part of a standard procedure, although they could not identify who, specifically, had calibrated the machine on the days in question. This calibration of the IR spectrophotometer involves following a standard checklist of eight functions. The State presented evidence that a miscalibration would either be detected by an error message from the machine or would likely be detected by an employee during the course of the day.

■ The use of standard procedures and internal checking of the machine is sufficient to establish a *prima facie* case of the machine's

accuracy and reliability during the test. *See State v. LaFountain*, 108 N.H. 219, 220–21, 231 A.2d 635, 638 (1967); *State v. Stevens*, 467 S.W.2d 10, 23 (Mo.), *cert. denied*, 404 U.S. 994 (1971); *United States v. Lopez*, 328 F. Supp. 1077, 1086 (E.D.N.Y. 1971); *People v. Jones*, 10 Misc. 2d 1067, 171 N.Y.S.2d 325 (N.Y. City Magis. Ct. 1958). In addition, in this case the fact that the generated graphs matched the many elements of the standard comparison graphs leads to a strong inference that the IR spectrophotometer was in working order. *See* McCormick, *Scientific Evidence: Defining a New Approach to Admissibility*, 67 IOWA L. REV. 879, 911–12 (1982).

 In this case, the logic of the test argues overwhelmingly for its accuracy. In any given test, four results are possible: (1) the circumstances exist, and the test indicates that they do (a true positive); (2) the circumstances exist, but the test indicates that they do not (a false negative); (3) the circumstances do not exist, and the results indicate that they do not (a true negative); (4) or the circumstances do not exist, but the test indicates that they do (a false positive). In contrast to the radar gun or the blood alcohol reading, which measure only a quantity, and by absolute measurement are subject to any of the four results, the IR spectrophotometer creates a complex graph consisting of a series of peaks and valleys. Although the machine is programmed not to function if miscalibrated, even if it produced an erroneous graph it is statistically implausible, if not impossible, that the resulting graph would match with the exact known sample graph being tested against. Therefore, any false results will produce false negatives, not false positives. The error of miscalibration only benefits the defendant, not the State. *Cf. United States v. Williams*, 583 F.2d 1194, 1199 (2d Cir. 1978), *cert. denied*, 439 U.S. 1117 (1979); *Downing*, 753 F.2d at 1239 (any shortcomings in the scientific technique or its application would result in the inability to match the spectrograms rather than an erroneous conclusion that the two spectra were generated by the same substances).

 Therefore, while we question the State's failure to keep calibration logs, this factor alone does not make the evidence inadmissible. There was sufficient evidence from which to conclude that the machine was reliable. The State also showed sufficient evidence for the trial court to infer that, even if a faulty result was obtained, the chance of resultant prejudice to the defendant was extremely remote, if not nonexistent. The testimony based on the challenged tests was properly admitted.

*Affirmed.*

All concurred.