VIGIL, Judge (concurring in part, and dissenting in part). {48} I concur in the suppression issue disposition, but respectfully dissent in regard to the confrontation clause. {49} The Sixth Amendment directs: “In all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him[.]” Crawford holds that the right of confrontation protected by the Sixth Amendment applies to “testimonial” out-of-court statements. 541 U.S. at 51. For the following reasons, I conclude that the test results performed by Ms. Nardoni were admitted as substantive testimonial evidence at Defendant’s trial and that Defendant was deprived of his right to cross-examine Ms. Nardoni in violation of his constitutional right of confrontation under the Sixth Amendment.[2] Since my colleagues in the majority disagree, I dissent. {50} Crawford does not set forth a comprehensive definition of what constitutes a “testimonial statement.” Rather, Crawford sets forth various formulations of the “core class of‘testimonial’ statements” to which the confrontation right extends. Id. One such formulation is “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial}.]” Id. at 52 (internal quotation marks and citation omitted). {51} In this case, Officer Clay seized the evidence from Room 102 that was used to convict Defendant. The evidence included a spoon and a plastic bag, both of which contained an unknown white crystalline substance, and they were sent to the State forensic laboratory in Hobbs for analysis. The evidence was collected in a criminal case for possession of a controlled substance, the evidence was sent to the State forensic laboratory for the express purpose of proving that it contained a controlled substance, and using the results of that test in a criminal prosecution to prove an essential element of the crime against Defendant. The laboratory test results were therefore clearly statements “that were made under circumstances which would lead an objective witness reasonably to believe that the statements] would be available for use at a later trial}.]” Id. (internal quotation marks and citation omitted). As such, the laboratory test results constitute “testimonial” out-of-court statements under the Confrontation Clause of the Sixth Amendment. {52} To answer the question before us requires that we determine what the results of an infrared spectrophotometer test consist of. Thus, I begin with the science and technology on which the infrared spectrophotometer test is based. The Fourier Transform Infrared Spectrophotometer (FTIR) was developed from the base technology of an Infrared Spectrometer (IR) which was first discovered at the turn of the century. Infrared radiation refers to the wavelengths of light that are just beyond the color red in the visible spectrum of light. Infrared radiation is absorbed by various materials in different ways. This variance in absorption is measurable by sensors contained within an IR and an FTIR as infrared radiation is passed through a sample of material. The traditional IR was little more than a prism disbursing light. The FTIR expanded upon the IR technology with a two}-]way mirror device which splits the single beam of infrared light into two beams — passing one beam through the sample of material and then putting the two beams back together. The reunited beam of light now has different characteristics than it originally did based upon the absorption of various wavelengths of light by the unknown sample of material. A complex mathematical equation (named a Fourier Transform) is then applied to the wavelengths in order to separate out the intensity of each independent wavelength. The computer within the FTIR then produces a graphical representation of those wavelengths which can be compared visually and with computer aids against graphs produced by known substances. People v. Roraback, 666 N.Y.S.2d 397, 399 (N.Y. Sup. Ct. 1997), aff’d 668 N.Y.S.2d 781 (N.Y. App. Div. 1998); see People v. Partee, 814 N.E.2d 238, 241 (Ill. App. Ct. 2004) (explaining that the infrared spectrophotometer works by sending a beam of infrared light onto the unknown sample, and because different drugs, and different molecules in general, absorb infrared light at different wavelengths and degrees, the machine produces a chart that can be compared to charts of known standards to identify the unknown substance); Cole v. State, 835 A.2d 600, 605 (Md. 2003) (stating that the infrared spectrophotometer produced a graphical representation of an infrared spectrum generated by the tested unknown substances that was substantially similar to the spectrum generated by a “library” test result of a known substance (internal quotation marks omitted)); State v. Lee, 593 A.2d 235, 236-37 (N.H. 1991) (“The IR spectrophotometer operates by focusing a beam of radiant light on the substance. It then measures the amount of energy absorbed, and graphs the energy spectrum emitted. Each substance has a unique graph pattern of energy peaks and valleys. By comparing this pattern with the graph of a ‘known’ substance, the expert can evaluate whether the substances are the same.”). Although not as detailed, Mr. Hightower’s testimony about the test conducted in this case is consistent with these descriptions of the test. {53} Thus, there is one infrared spectrophotometer test which consists of two essential component parts. First, an infrared beam of light is focused onto a sample of an unknown substance. This results in a graphical pattern of energy peaks and valleys which is reported on a graphical chart prodirced by the machine because different substances absorb infrared light at different wavelengths and degrees. Second, the graphical chart of the unknown substance produced by the machine is compared to a library of graphical charts of known substances (reference charts), and when there is a match between the charts, a conclusion can be made about what the unknown substance is. The first part of the test was performed by Ms. Nardoni, who did not testify, and the second part was performed by Mr. Hightower, who did testify. Further, the analysis undertaken in the second part of the test by Mr. Hightower is only valid if the work performed in the first part was properly performed by Ms. Nardoni. {54} As the forensic scientist who performed the first part of the test, Ms. Nardoni was required to take measures to ensure that the machine obtained an accurate graphical representation of the wavelengths of the unknown substance. Mr. Hightower testified that to insure there is no cross-contamination with the unknown substance being tested, safeguards must be manually performed for each test: (1) only one case is tested at a time so that substances from other cases are not all out at one time; (2) the person doing the test must make sure all of the lab area is cleaned before any future test is performed; and (3) the surface where the material is placed inside the spectrophotometer must be cleaned before each test is performed. However, Mr. Hightower was unable to testify whether these safeguards were performed by Ms. Nardoni, and he could not comment on whether any other required steps to insure a valid result were performed by her, “because I didn’t see those tests.”[1] {55} Thus, this case is similar in one material respect to Bullcoming. In Bullcoming, a forensic laboratory report setting forth the defendant’s blood-alcohol content (BAC) was completed and signed by the analyst who tested the defendant’s blood using a gas chromatograph machine. 131 S. Ct. at 2710-11. The gas chromatography process entails inserting vials of the suspect’s blood into the gas chromatograph machine which then produces a printed graph along with calculations representing a software-generated interpretation of the data. Id. at 2711 n. 1. The results are then recorded by the analyst on the forensic laboratory report. Id. {56} The Bullcoming Court noted that “[s]everal steps are involved in the gas chromatograph process, and human error can occur at each step.” Id. at 2711. The Court added that while the state had presented testimony that an accurate B AC measurement merely entails looking at the machine and recording the results, “the matter is not so simple or certain” because the analyst “must be aware of, and adhere to, good analytical practices and understand what is being done and why.” Id. at 2711 n.l. The Supreme Court further observed, “Errors that occur in any step can invalidate the best chromatographic analysis, so attention must be paid to all steps” and that “93% of errors in laboratory tests for BAC levels are human errors that occur either before or after machines analyze samples.” Id. (internal quotation marks and citation omitted). At footnote 7, the Supreme Court added that the testimony of the analyst who performed the test under oath “would have enabled Bullcoming’s counsel to raise before a jury questions concerning [his] proficiency, the care he took in performing his work, and his veracity.” Id. at 2716 n.7. {57} Mr. Hightower could not present any testimony or evidence of what Ms. Nardoni did, how she did it, or why. All that Mr. Hightower had was the graphic chart which the spectrophotometer machine produced as a result of her actions. Mr. Hightower then told the jury that in his opinion, the known reference graph pattern of methamphetamine matched the graph pattern of the unknown substance which Ms. Nardoni produced. {58} It seems clear, and the majority does not appear to dispute, that if Ms. Nardoni had dated and signed the chart of the unknown substance produced by the machine, and the State had been allowed to introduce the chart into evidence as her “report” through Mr. Hightower, Defendant’s confrontation rights would have been violated. See id. at 2709-10, 2717-18; Melendez-Diaz, 557 U.S. at 307-11l. Nevertheless, the majority concludes that no confrontation violation occurred because the chart itself was not introduced into evidence. However, this overlooks the fact that without the chart produced by Ms. Nardoni, Mr. Hightower had nothing to compare the reference chart of known methamphetamine to. Moreover, Mr. Hightower testified that the chart of the unknown substance produced by Ms. Nardoni’s operation of the infrared spectrophotometer was identical to the known reference graphic chart of methamphetamine. The end result, therefore, was that the chart produced by Ms. Nardoni’s work was considered as substantive evidence. Applicable case law leads me to conclude that a constitutional confrontation violation resulted. {59} I first note that the case law addressing whether the work of a non-testifying expert has been admitted and considered as substantive evidence in a jury trial is extremely limited. The majority fails to cite to any applicable authority, and I have only found two cases, both of which predate Melendez-Diaz, Bullcoming, and Williams. {60} In Roberts v. United States, 916 A.2d 922, 925 (D.C. 2007) (per curiam), a supervisory DNA analyst who did not actually conduct the testing testified that the defendant’s DNA matched DNA taken from the victim’s clothing. The testing consisted of three parts: a serologist who conducts tests on material for the presence of blood, semen, or other biological fluids suitable for DNA analysis; a PCR/STR technician who prepares test samples for DNA-typing and operates the instrument that actually determines the DNA types found in the samples; and an analyst who interprets the data produced by the DNA-typing instrument and memorializes his conclusions in a report. Id. at 937. The testifying supervisory analyst did not perform any of these tests but nevertheless testified that the opinions he was testifying to were his own because he went through the case as if it were his own and came to his own conclusions and interpretations. Id. at 937-38. While the written report of the non-testifying analyst was not introduced into evidence, the testifying supervisory analyst referred to it from time to time in his testimony. Id. at 938. Thus, the prosecution conceded that some of the test results on which his opinion was based “were offered as substantive evidence,” and the court concluded that the defendant “was erroneously denied the right to cross-examine witnesses whose conclusions formed part of the DNA evidence against him.” Id. at 939. {61} Similarly, in Veney v. United States, the prosecution’s expert testified that the defendant’s DNA matched DNA formd on various articles of the victim’s clothing. 929 A.2d 448, 468 (D.C. 2007), modified by 936 A.2d 809 (D.C. 2007). She based her conclusion on data generated by foundational tests on the clothing conducted by two other scientists who did not testify. Id. One scientist tested the clothing for blood and semen, and the second operated a machine that performed a PCR/STR analysis which resulted in a computer-generated graph produced by the machine. Id. at 468-69. While the testifying expert used her own interpretation of the DNA evidence, she “made references to the serology tests and the data produced by the operation of a DNA-typing instrument, both carried out by other scientists on the team[.]” Id. at 469. Thus, the court concluded, the foundational test results were arguably offered as substantive evidence, and assuming a constitutional violation, the courtproceededto determine whether plain error resulted from admission of the evidence. Id. at 469; 936 A.2d at 810; see also Gardner v. United States, 999 A.2d 55, 61 (D.C. 2010) (stating that Veney concluded that the foundational test results were offered as substantive evidence because the testifying expert referred to them). {62} Veney and Roberts are directly on point. In the case before us, Mr. Hightower testified that he referred to the graphic chart of the unknown substance produced by Ms. Nardoni’s operation of the infrared spectrophotometer and that the graphic chart of the unknown substance matched the reference graphic chart of methamphetamine. Majority Op. ¶ 3. Mr. Hightower’s testimony that the two charts are the same resulted in the chart of the unknown substance being admitted before the jury as substantive evidence against Defendant. Stated another way, the result of Ms. Nardoni’s work (the graphic chart of the unknown substance) was placed in evidence for the truth of the matter asserted — that the graphic chart resulting from her work is identical to a reference chart produced by methamphetamine (the known substance). Thus, while the piece of paper which itself depicted the chart was not introduced into evidence, the information contained on the chart was. However, Defendant was not given an opportunity to cross-examine Ms. Nardoni, the forensic scientist who performed the part of the infrared spectrophotometer test which resulted in that chart. {63} The majority also concludes that the spectrophotometer graph generated by the machine is not a “statement” and therefore it “was not a testimonial statement.” Majority Op. ¶ 26. In support of this conclusion, the majority relies on Moon, 512 F.3d at 361-62, which states, “Yet the instruments’ readouts [from an infrared spectrometer and a gas chromatograph] are not ‘statements’, so it does not matter whether they are ‘testimonial.’ ” Majority Op. ¶ 26. Respectfully, I disagree, as it seems well settled that assertions of fact generated by a computer are considered as hearsay statements that must qualify as a hearsay exception to be admissible. See Rule 11-801 (C) NMRA (defining hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted); Roark v. Farmers Group, Inc., 2007-NMCA-074, ¶¶ 24-29, 142 N.M. 59, 162 P.3d 896 (concluding that a computer-generated document is admissible as a business record exception to the hearsay rule); State ex rel. Elec. Supply Co. v. Kitchens Constr., Inc., 106 N.M. 753, 756, 750 P.2d 114, 117 (1988) (concluding that computer data compilations may be construed as business records that are admissible as an exception to the hearsay rule under Rule 11-803 NMRA). In his dissent in United States v. Washington, 498 F.3d 225, 233 (4th Cir. 2007), Judge Michael cites to numerous cases[2] in stating, “Courts consistently consider computer-generated assertions of fact as hearsay that are admissible only under one of the exceptions to the hearsay rule.” I also agree with Judge Michael that although test results may be computer-generated, if they are generated with the assistance and input of a technician or scientist, they must be attributed to the technician or scientist. Id.[3] This seems to be implicit in Bullcoming when the Supreme Court concluded that although there was evidence that the analyst who tested the defendant’s blood merely looked at the gas chromatography machine and recorded the results on a report into evidence, admission of the report violated the defendant’s right of confrontation because the analyst who filled out the report did not testify. 131 S. Ct. at 2710-11 & n.1. {64} The unknown substance in this case was tested so the results could be used against Defendant in a criminal prosecution against him. The results clearly constituted a testimonial statement and without testimony from the person performing the test, inadmissible under the Confrontation Clause. That was the factual backdrop and result in Bullcoming, Melendez-Diaz, and Crawford. See Bullcoming, 131 S. Ct. at 2717; Melendez-Diaz, 557 U.S. at 310; Crawford, 541 U.S. at 68. {65} Moreover, Williams is of no assistance to the result reached by the majority here. Williams was a bench trial without a jury in which an expert witness in forensic biology and forensic DNA analysis testified that in her opinion, DNA profiles produced by two separate tests matched. 132 S. Ct. at 2230-31. The first DNA profile was provided by a test conducted by Cellmark Diagnostic Laboratory (Cellmark) ofvaginal swabs taken from a rape victim before the defendant or anyone else was under suspicion for the rape. Id. at 2229. The second DNA profile was provided by a test conducted by the state police lab from a sample of the defendant’s blood that was taken after he was arrested on an earlier unrelated charge. Id. The analyst who performed the test at the state police lab testified at trial, but no one from Cellmark testified. Id. at2229-30. The Cellmark report itself was not admitted into evidence, and the expert did not quote or read from the report or identify it as the source of any of her opinions. Id. at 2230. The United States Supreme Court had no trouble in concluding that neither test report was a “testimonial statement” under the Confrontation Clause because neither one was made when the defendant was a target of the rape investigation, and thus not made for the primary purpose of accusing a targeted individual. Id. at 2242-44. Without a “testimonial statement” there was no constitutional confrontation violation. Id. On the other hand, the statement before us in this case is testimonial. Further, because the expert in Williams testified that it was a commonly accepted practice in the scientific community for one DNA expert to rely on the records of another DNA expert, that Cellmark was an accredited crime lab and that she and experts in her field regularly relied on the protocols used in this case, id. at 2229-30, the United States Supreme Court concluded the expert testimony was admissible under the Federal Rules of Evidence. Id. at 2233-35. See Fed. R. Evid. 703 (stating that an expert may base an opinion on facts or data “that the expert has been made aware of or personally observed,” and “[i]f experts in the-particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted”). New Mexico’s counterpart to the federal rule is Rule 11-703. However, in this case, the State failed to lay a foundation to allow Mr. Hightower to express an opinion based on the part of the test performed by Ms. Nardoni. Even if it had, the objection based on the Confrontation Clause would remain. Finally, the United States Supreme Court concluded, because this was a bench trial there was no danger that the fact finder improperly considered inadmissible hearsay evidence. Williams, 132 S. Ct. at 2236. On the other hand, the majority in Williams also conceded that the dissent’s argument to the contrary “would have force” if the defendant had been tried by a jury. Id. This case, unlike Williams, was tried to a jury. {66} Finally, I disagree with the majority that Mr. Hightower gave his conclusions based on his independent evaluation of Ms. Nardoni’s work product. Majority Op. ¶ 39. Because an infrared spectrophotometer test is performed in two distinct parts, and Mr. Hightower could not evaluate whether Ms. Nardoni properly performed the first part of the test, he was in fact used as a “mere conduit” to present her testimonial hearsay evidence to the jury. Melendez-Diaz notes that confrontation and cross examination are designed to “weed out not only the fraudulent analyst, but the incompetent one as well” and notes that “[sjerious deficiencies have been found in the forensic evidence used in criminal trials.” 557 U.S. at 319. Those concerns continue.[4] We have no evidence that Ms. Nardoni was either fraudulent or incompetent, but if such was the case, it would escape detection if, as the majority holds, the results of her work could simply be parroted by a witness such as Mr. Hightower who had no knowledge of whether she followed proper protocols necessary for a valid test result. {67} Unlike my colleagues in the maj ority, I conclude that a testimonial statement (the graphic chart) of a witness (Ms. Nardoni) was admitted into evidence in violation of Defendant’s right under the Confrontation Clause of the Sixth Amendment because Defendant was unable to cross-examine Ms. Nardoni. I therefore dissent. MICHAEL E. VIGIL, Judge The majority asserts, “there is a lack of preservation.” Majority Op. ¶ 41. Respectfully, I disagree. Even the State acknowledges in its answer brief that when Defendant objected to Mr. Hightower rendering an opinion about the evidence, “Defendant argued Mr. Hightower’s opinion testimony would violate his right of confrontation because Mr. Hightower was not the analyst who had placed the evidence on the spectrophotometer and Mr. Hightower did not have firsthand knowledge of the chain of custody from the time the evidence left the Roswell Police Department.” This was sufficient to preserve the issue for our review. See State v. Griffin, 2003-NMCA-051, ¶ 5, 130 N.M. 595, 28 P.3d 1136 ("The purpose of the preservation requirement is twofold: (1) that the trial court be alerted to the error so that it is given an opportunity to correct the mistake, and (2) that the opposing party be given a fair opportunity to meet the objection.” (internal quotation marks and citation omitted)). The majority asserts that “the record has only testimony regarding one safeguard” which consists of cleaning the surface of the spectrophotometer, Majority Op. ¶ 41; that “the only human error possibly at issue is whether the surface upon which the substance was placed may not have been cleaned,” Majority Op. ¶ 43; and that “the only question that defense counsel might have raised could have been whether Ms. Nardoni properly cleaned the equipment’s surface.” Id. These assertions are refuted by the actual testimony. During Mr. Hightower’s testimony a note was sent by the juiy asking about cross contamination. The court then asked the following questions, and Mr. Hightower answered as follows: Q. Mr. Hightower I have few questions for you. A. Yes sir. Q. Has there ever been a time where cross-contamination occurred? A. We have several preventive measures against that, and to my knowledge no, there’s never been a time we only do, all we do one case at a time so we don’t have all the cases out at once and we make sure our lab area is clean before any future cases are done and in the case of the infrared spectrophotometer the material is placed right on it. It’s cleaned before the next sample and a background is actually run before to make sure that it is clean and, if it wasn’t cleaned, you would actually be able to see it on the examining surface and the test wouldn’t proceed so, to my knowledge, no. Q. Is the evidence and I believe it says, other substance or your substance side by side during testing? A. That, the . . . the evidence, the items possibly could be side by side like I said case wise, there would be no other cases open at this . .. besides this case right here. So, yes there are times when you line up your vials and you will.. . you will do the items to .. . . They’ll be side by side but as far as any other cases, no. Q. If a machine can give a false, positive, or negative, is there a way to do a manual test and was that performed. Was oneperformed? A. The manual test uh . . . Q. And maybe I need to make it clearer, and it appears to be two parts to the question. And, I’ll just quote it. “A machine can give false, positive, or negative. Is there a way to do a manual test and was one performed?” A. There is .... I think .... There’s a manual test on the instrument, um that we test the standard that’s part of our weekly test. I’m not sure if that’s what you’re asking. There are other manual tests as far such as color tests and stuff like that. , Those are performed um but, Ireally can’t testify to that, because I didn’t see those tests. So, I can testify to this data, since I wasn’t there to see any other color tests or anything like that I can’t comment on those. “United States v. Blackburn, 992 F.2d 666 (7th Cir. 1993) (computer printouts of lensometer readings); United States v. Enterline, 894 F.2d 287 (8th Cir. 1990) (computer report identifying vehicle as stolen); United States v. Baker, 855 F.2d 1353 (8th Cir. 1988) (laboratory analyses of controlled substances); United States v. DeWater, 846 F.2d 528 (9th Cir. 1988) (breathalyzer test result); United States v. Hardin, 710 F.2d 1231 (7th Cir. 1983) (computer-generated graph of data collected by law enforcement); United States v. McKinney, 631 F.2d 569 (8th Cir. 1980) (blood test results); State v. Madorie, 156 S.W.3d 351 (Mo. 2005) (breathalyzer test result); City of Helena v. Hoy, 248 Mont. 128, 809 P.2d 1255 (1991) (same).” On the other hand, if the computer-generated assertion is produced without any human assistance or input, it cannot be considered a person’s assertion. See United States v. Hamilton, 413 F.3d 1138, 1142 (10th Cir. 2005) (noting that the computer-generated header information that accompanied an image on the internet was not a hearsay statement because it was automatically generated by the computer without the assistance or input of a person); United States v. Khorozian, 333 F.3d 498, 506 (3d Cir. 2003) (concluding that the transmission information on a faxed document was not a hearsay statement because it was automatically generated by the fax machine). Washington, 498 F.3d at 233 (Michael, J., dissenting). Peter Jamison, SFPD Crime Lab’s DNA Evidence Could Be Tainted by Concealed Mistakes, SF Weekly, Dec. 15, 2010, available at http ://www. sfweekly. com/2010-12-15/news/sipd-s-trou bled-crime-lab-more-evidence-of-screwups-and-coveru ps/; Eugenie Samuel Reich, Boston Scandal Exposes Backlog, Nature, Oct. 9, 2012, available at http://www.nature.com/news/boston -scandal-exposes-backlog-1.11561; David Boeri, State Lab Chemist Told Police She Intentionally Falsified Test Rerato,WBUR, Sept. 27, 2012, available at http://www.wbur.org/2012/09/27/annie-dookhan-state ment.